ESTATE OF HARRY R. MICHELSON, DECEASED, SOUTH SHORE BANK (formerly South Shore National Bank) and CHARLES L. MICHELSON, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Michelson v. Commissioner
Docket No. 8857-77.
United States Tax Court
T.C. Memo 1978-371; 1978 Tax Ct. Memo LEXIS 143; 37 T.C.M. (CCH) 1534; T.C.M. (RIA) 78371; September 18, 1978, Filed John Henderson Linsley, for the petitioner. Barry J. Laterman, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency in petitioner's Federal estate tax in the amount of $ 48,138.21. After concessions, the only issue in dispute between the parties is the includability in the decedent's gross estate, under sections 2036 and 2038, I.R.C. 1954, of the value of 49 shares in the Michelson Realty Trust registered in the name of decedent's adult son. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. South Shore Bank (formerly South Shore National Bank) and Charles L. Michelson are the executors of the Estate of Harry R. Michelson, who died on January 12, 1974, a resident of Hingham, Massachusetts. At the time the petition herein was filed, South Shore Bank's principal office was located in Quincy, Massachusetts, and Charles L. Michelson resided in Hingham, Massachusetts. Charles L. Michelson and Albert J. Michelson are the decedent's two sons. Decedent *145 was living in Hingham, Massachusetts, in 1929, when his younger son, Charles, was born. At about that time, decedent purchased property in Hingham and began to operate a dairy farm. Over the years he expanded his holdings, purchasing additional farmland in Bridgewater, West Bridgewater, East Bridgewater, Easton, Plympton, and Marshfield, Massachusetts. Over the years he also expanded his operations to include not only the dairy farming business but also the business of buying and selling cattle. From an early age, decedent's two sons worked in the family businesses, gradually taking on added responsibilities as they grew older. In the mid-1950's, when the sons were in their twenties, the father and two sons agreed, at least informally, to form a partnership in which they would together conduct the family businesses. Thereafter the two sons participated fully in the management and other aspects of the businesses, which came to be known as Harry R. Michelson and Sons. It appears that partnership returns were filed for Federal income tax purposes, but title to the real property used by the businesses remained generally in decedent's name alone. [1] The record does not show whether *146 gift tax returns were ever filed by decedent in respect of property used by the partnership. In about 1960 Albert moved to New York State. Decedent and Charles paid him a sum of money on account of his interest in the family businesses, and thereafter decedent and Charles continued the businesses as equal partners. In 1964 or thereabouts, decedent suffered a heart attack, and thereafter determined to devote less time to his business operations. On December 31, 1964, a corporation was formed with the name Michelson's Livestock Commission Auctions, Inc. Decedent and Charles each received 50 percent of the shares of this corporation, which took title to the tangible and intangible personal property used in the cattle buying and selling business and continued to operate that business. On or about December 31, 1968, a second corporation, Michelson's Land and Cattle Corporation, was formed. Decedent and Charles each received 50 percent of the shares of this corporation, which took title *147 to the tangible and intangible personal property used in the dairy farming business and continued to operate that business. On or about December 5, 1968, decedent and Charles created the Michelson Realty Trust by executing a Declaration of Trust which was subsequently filed at the Massachusetts Department of Corporations and Taxation as required by Chapter 182 of the General Laws of the Commonwealth of Massachusetts. The Declaration of Trust named decedent and Charles as trustees of the Michelson Realty Trust, and they remained its two trustees at all times relevant to this proceeding. [2] The Declaration of Trust provided that the beneficial interest in the trust estate was to be in the holders of transferable shares of beneficial interest, and a total of 100 such shares were issued and outstanding at all times relevant to this proceeding. On or about December 16, 1968, 51 shares of beneficial interest of the Michelson Realty Trust were issued to decedent and the remaining 49 shares were issued to Charles. At all times relevant to this proceeding, said shares were held by decedent and Charles. *148 On or about December 30, 1968, nine deeds conveying real property to the Michelson Realty Trust were executed.Eight of the deeds were executed by Harry R. Michelson, individually, as grantor, and the remaining deed was executed by "Harry R. Michelson and Charles L. Michelson, co-partners in trade, d/b/a Harry R. Michelson & Sons, as joint tenants," as grantors. The property conveyed to the Michelson Realty Trust was the real property which had been used in the family cattle buying and selling and dairy farming businesses.Michelson Livestock Commission Auctions, Inc. and Michelson's Land and Cattle Corporation, respectively, subsequently leased the real property from the Michelson Realty Trust. The Michelson Realty Trust filed Federal corporate income tax returns as an association taxable as a corporation. In addition to his interest in the family businesses, decedent owned, either individually or jointly with his wife, a substantial amount of real and personal property. Except for jointly owned property which passed to his widow by operation of law, decedent disposed of this individually-owned property by means of two documents: a will, dated November 5, 1971, and admitted to *149 probate by the Plymouth County Probate Court on March 13, 1974; and a revocable living trust between himself, as Settlor, and Charles and the South Shore National Bank, as Trustees, dated November 21, 1968, and amended by a written instrument dated November 5, 1971. The Commissioner determined that the value of the 49 shares of the Michelson Realty Trust standing in the name of Charles L. Michelson at the date of decedent's death was includable in decedent's gross estate pursuant to sections 2036 and 2038, I.R.C. 1954. The Commissioner also made other adjustments which are no longer in issue. OPINION In December 1968, decedent and his son Charles created the Michelson Realty Trust and transferred to it real property which had been used in the family businesses of dairy farming and cattle buying and selling. The Michelson Realty Trust was a Massachusetts business trust registered under Chapter 182 of the General Laws of the Commonwealth of Massachusetts. Pursuant to the Declaration of Trust, 100 transferable shares of beneficial interest in the trust were issued, of which 51 were registered in decedent's name and 49 in Charles' name. Relying on sections *150 2036 and 2038, I.R.C. 1954, [3] the Commissioner included in decedent's gross estate the value of the 49 shares registered in Charles' name. The only issue presented is whether the Commissioner's action in this respect was correct. *151 Both section 2036(a) and section 2038(a)(1) exclude from their operation bona fide sales for an adequate and full consideration in money or money's worth. See section 20.2043-1(a), Estate Tax Regs. Petitioner argues that the value of Charles' shares in the Michelson Realty Trust may not be included in decedent's gross estate under either section because the creation of the trust and the issuance of its shares involved no gratuitous transfers. Rather, petitioner argues, Charles received his 49 shares in the trust in exchange for his partnership interest in the land conveyed to the trust. Our consideration of this case has been hampered by a poor record in which much of the evidence was loosely presented and in whcih many potentially relevant details are tantalizingly missing. Indeed, during the course of the trial we were often confused by the murky unfolding of the case.However, notwithstanding that the burden of proof was on the petitioner, we are convinced upon a review of all the evidence and our evaluation of Charles' credibility as a witness that, sometime in the mid-1950's, decedent *152 took his two sons into full partnership in the ownership and management of the family businesses. Cf. section 704(e), I.R.C. 1954, and section 1.704-1(e), Income Tax Regs.
From a very early age, each of the two sons worked in the businesses. In the mid-1950's, when the young men were in their twenties, decedent told them he wanted them to be his partners and to share fully in the operation of the businesses. Although it is not clear whether there was ever a written partnership agreement, partnership returns were filed for Federal income tax purposes, and the business came to be known as Harry R. Michelson and Sons. About 1960, when Albert expressed the desire to leave Massachusetts and settle in New York State, decedent and Charles paid him a sum of money in settlement of his partnership interest, and thereafter continued the businesses as equal partners. Although formal title to most of the real estate used by the partnership remained in decedent's name alone, title to at least one tract was in the names of decedent and Charles "as co-partners in trade". The record does not show that decedent filed gift tax returns in connection *153 with the creation of the partnership in the mid-1950's, but both decedent and Charles subsequently acted in a manner consistent with the existence of a bona fide partnership. Both men worked hard in the business, and both contributed to its management. In 1964, after decedent suffered a heart attack, they apparently decided that it would be desirable to change the structure of the business in order to allow decedent to withdraw to some extent from the active conduct of the business. In 1964, therefore, they incorporated the cattle buying and selling business as Michelson's Livestock Commission Auctions, Inc., with each taking 50 percent of the shares of the new corporation. Later, in 1968, they incorporated the dairy farming business as Michelson's Land and Cattle Corporation, each again taking 50 percent of the shares. At about the same time, they created the Michelson Realty Trust to own the land used by the two corporations. These actions bespeak a consistent plan to place the family businesses (previously conducted as an equal partnership by the decedent and Charles) under corporate or quasi-corporate forms, with father and son continuing, however, as virtually equal owners *154 of everything. By contrast, in November 1968 decedent created a personal trust (and later executed a will) as the means of disposing of the assets which he deemed to be his individually-owned property. The Government concedes that Charles' 50 percent stock interest in the two corporations is not includable in his father's gross estate; it contends only that Charles' 49 percent interest in the Massachusetts trust (which is taxable as a corporation) is includable in the gross estate under sections 2036(a) and 2038(a)(1) by reason of the trust mechanism employed. However, we find, on the basis of a difficult record, that Charles was the owner, prior to December 1968, of a one-half interest in the entire family enterprise known as Harry R. Michelson and Sons, and that he received his 49 shares in the Michelson Realty Trust solely in exchange for his 50 percent partnership interest in the lands conveyed to the trust. There being no gratuitous transfer involved in the creation of the Michelson Realty Trust, there is no basis for the application of either section 2036(a) or section 2038(a)(1). In light of this finding, we need not reach the alternative contentions of the parties relating *155 to the applicability of these sections. Decision will be entered under Rule 155. Footnotes
1. At least one piece of real estate came to be held in the names of "Harry R. Michelson and Charles L. Michelson, co-partners in trade, d/b/a Harry R. Michelson & Sons, as joint tenants."↩
2. The Declaration of Trust included the following provisions: NOW, THEREFORE, it is hereby agreed and declared, that the Trustees shall hold the said real estate and any other property and assets of every kind and nature both tangible and intangible at any time acquired or received by them as Trustees hereunder, together with the income therefrom and the proceeds thereof -- all of the foregoing while so held being hereinafter generally called "the trust estate" -- in trust, in the manner and with and subject to the powers and provisions hereinafter contained concerning the same for the benefit of the holders for the time being of the shares of this trust (hereinafter collectively called "the Shareholders"), according to their respective interests. ARTICLE 1
Concerning Organization and Powers
* * *
1.3. Business and Powers. The Trustees, subject only to the specific limitations in this Declaration contained, shall have the absolute control, management and distribution of the trust estate, and the conduct of the business of this trust. They shall have powers from time to time: * * *
(b) To issue for cash, or as a dividend ratably to the Shareholders, or in payment for or as consideration for the acquisition of any property, shares of beneficial interest herein, in such amounts and kinds and in such proportions and to such persons as the Trustees may in their discretion determine, but subject nevertheless to the conditions and limitations in regard to the issue of shares hereinafter contained; * * *
(i) To distribute any of the trust property in specie among the Shareholders in proportion to the number of shares held by them; * * *
Notwithstanding anything contained in this ARTICLE 1 to the contrary, the Trustees shall not have any power or authority to borrow money on the credit of or on behalf of the Shareholders or to make any contract on their behalf for repayment of any money raised by mortgage, pledge, or charge in pursuance of the provisions hereof, or to make any contract or incur any liability whatever on behalf of the Shareholders or binding them personally. ARTICLE 2
Concerning the Trustees
* * *
2.5. Removal of Trustees and Appointment of Successors. The holders of a majority of the common shares of this trust shall have power at any time or times by an instrument in writing filed for record in the Registry of Deeds for said County of Plymouth to appoint an additional Trustee or Trustees, or to remove any Trustee with or without cause, or to appoint any Successor Trustee or Trustees to fill any vacancy or vacancies in the office of Trustee, however caused. Except in the case of death, resignation or removal, a Trustee shall continue in office and shall continue vested with the title to the trust estate until a new Trustee is appointed to succeed him and qualifies as herein provided. Each new Trustee shall qualify by filing his written acceptance in the Registry of Deeds for said County of Plymouth, whereupon title to the trust estate shall vest in the continuing Trustees and the new Trustee. The Trustees may, but need not be, Shareholders. * * *
2.8. Apportionment of Proceeds upon Termination of Trust. Upon the termination of this trust the Trustees shall sell and convert into money the whole of the trust estate, except so much as they shall determine to distribute in specie, and after paying or retiring all liabilities and obligations of the trust they shall apportion the proceeds thereof, and so much of the trust estate as they shall have determined to distribute in specie, among all the Shareholders ratably according to the kind and number of the said shares held by them respectively. 2.9. Validity of Action without a Meeting. The Trustees may act with or without a meeting. The action of a majority of the Trustees shall be valid and binding as the action of the Trustees, and a certificate of such action signed by a majority of the Trustees shall be conclusive thereof. * * *
ARTICLE 3
Concerning Shares and Shareholders
* * *
3.3. Issue of Shares. Authorized shares of this trust may be issued from time to time in such amounts as the Trustees may determine, either for cash, services, securities, property or other value, or by way of stock dividend or in exchange for other shares of this trust at the time outstanding, as full-paid or part-paid shares, and at such price and upon such terms as to valuation of services, securities, property or other value or other shares, and otherwise, as the Trustees may in their absolute discretion see fit and irrespective of par value thereof, if any; provided,however, that before any authorized shares shall be issued by the Trustees, the Trustees shall have first made the offer to sell hereinafter described and such offer shall not have been accepted: * * *
3.8. Transfer of Shares. Any Shareholder, including the heirs, assigns, executors or administrators of a deceased Shareholder, desiring to sell or transfer such shares owned by him or them, shall first offer them to the trust through the Trustees, in the manner following: He shall notify the Trustees of his desire to sell or transfer by notice in writing addressed to any one of the Trustees and mailed by registered mail, postage prepaid, or delivered to such Trustee at the principal place of business of the Trustees, which notice shall contain the price at which he is willing to sell or transfer and the name of one arbitrator. The Trustees shall within thirty days thereafter either accept or reject the offer, or by notice to him in writing name a second arbitrator, and these two shall name a third. It shall then be the duty of the arbitrators to ascertain the value of the shares, and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator. After the acceptance of the offer, or the report of the arbitrators as to the value of the shares, the Trustees shall have thirty days within which to purchase the same at such valuation, but if at the expiration of thirty days, the Trustees shall not have exercised the right so to purchase, the owner of the shares shall be at liberty to dispose of the same in any manner he may see fit. No shares shall be sold or transferred on the books of the trust until these provisions have been complied with, but the Trustees may in any particular instance waive this requirement. * * *
ARTICLE 4
Concerning Liability
* * *
4.4. Liability of Trustees. The Trustees shall not be liable for anything done or omitted by them in good faith and shall be answerable and accountable only for their own receipts and for their own wilful acts, neglects and defaults respectively, and not for those of any other Trustee or any person employed by them or any one of them, nor of any bank, trust company, broker or other person with whom or into whose hands any moneys or securities may be deposited or come, nor for any defect in title of any property or securities acquired, nor for any loss unless it shall happen through their own wilful default respectively, and they shall be entitled to indemnity out of the trust estate against any liability incurred in the execution of the terms or provisions hereof. And no Trustee, however appointed, shall be obliged to give any bond or other surety for the performance of any of his duties in the said trusts. * * *
ARTICLE 5
Concerning Surplus and Dividends
5.1.Subject to the provisions of this Section and to the prior rights, if any, of any other securities of this trust which at the time may be outstanding, the Trustees in their discretion may from time to time declare dividends payable to Shareholders in proportion to the number of shares held by them at any date fixed by the Trustees out of the net profits or earned surplus of this trust, in cash or property, including, without limiting the generality of the foregoing, securities of this trust, and for that purpose may authorize the issuance of certificates and script and may capitalize all or any part of the surplus and may determine the number of dollars per share so capitalized; but no Shareholder shall have any right to any dividends, whether in cash, property or securities of this trust, except when and as such dividends shall be paid or notice shall have been given to all the Shareholders who are to receive such dividends that the same have been declared as aforesaid; and no Shareholder, Trustee or agent of this trust shall be liable personally for any such dividend, and every Shareholder entitled thereto shall look only to the trust estate for the payment of any such dividend. As between trustees and shareholders, in the absence of fraud the determination of the Trustees as to net profits, earnings and surplus, and as to any revaluation, or any other matter in connection with the payment of dividends shall be final and conclusive. ARTICLE 6
Amendment or Termination of Trust
6.1. Amendment or Termination of the Trust.↩ This trust may be amended or terminated by an instrument in writing signed by a majority of the Trustees and by the holders of a majority of the shares herein at such time outstanding and filed for record in the Registry of Deeds of said County of [Plymouth]. Unless so terminated the trusts contained in this Declaration shall continue in such manner that the Trustees shall have all the powers and discretions expressed to be given to them respectively by these presents and any amendment so made, and that no Shareholder shall be entitled to put an end to the same or to receive a division of the trust estate or any part thereof until the expiration of twenty-one years from the death of the survivor of the original Trustees, at which time this trust shall terminate.
3. The statutory provisions upon which the Commissioner relies provide as follows: SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death-- (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. * * *
SEC. 2038. REVOCABLE TRANSFERS.
(a) In General.--The value of the gross estate shall include the value of all property-- (1) Transfers after June 22, 1936.--To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death. Section 2036↩ has been amended effective after decedent's death. See section 2009(a), (e)(1), Tax Reform Act of 1976, Pub. L. 94-455.